IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

SANDRA MAHAFFY,                    :

          Plaintiff,               :
                                        Case No. 3:09cv0291
  vs.                              :
                                        District Judge Thomas M. Rose
MICHAEL J. ASTRUE,                 :    Magistrate Judge Sharon L. Ovington
     Commissioner of the Social
     Security Administration,      :

          Defendant.               :

## REPORT AND RECOMMENDATIONS[1]

## I.      INTRODUCTION

Plaintiff Sandra Mahaffy sought financial assistance from the Social

Security Administration by applying for Supplemental Security Income ["SSI"] in

March 2003 and Disability Insurance Benefits ["DIB"] in May 2003, alleging

disability since April 28, 1998. (Tr. 59-60, 354-57).  She claims disability from

hepatitis B, hepatitis C, rheumatoid arthritis, osteoarthritis, anxiety and

depression. (Tr. 80).

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

After various administrative proceedings, including an initial administrative hearing (Tr. 374-99) and decision (Tr. 240-56); a remand from the Appeals Council (Tr. 257-59); and a second administrative hearing (Tr. 400-37), Administrative Law Judge ["ALJ"] Melvin A. Padilla denied Plaintiff's SSI and DIB applications based on his conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act. (Tr. 32). The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration. Such final decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff now is due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #9), Plaintiff's Response (Doc. #10), the administrative record, and the record as a whole.

Plaintiff seeks a reversal of the ALJ's decision and remand for payment of benefits. The Commissioner seeks an Order affirming the ALJ's decision.

## II.    BACKGROUND

Plaintiff was 53 years old at the time of the final administrative decision, and thus was considered to be "closely approaching advanced age" for purposes

2

of resolving her DIB and SSI claims. *See* 20 C.F.R. §§ 404.1563(d); 416.963(d);[2] (*see also* Tr. 30, 59). She has a eighth grade, limited education. *See* 20 C.F.R. § 416.964(b)(3); (*see also* Tr. 86). Plaintiff has worked in the past as a kitchen helper /dishwasher, housekeeper/cleaner, order filler and assembler/production worker. (Tr. 97 - 118A).

Plaintiff testified at the first administrative hearing that she last worked in May 2002, as a housekeeper at a nursing home. (Tr. 378). At both administrative hearings, Plaintiff testified that she is disabled due to arthritis in her neck, back and shoulder pain, hepatitis, depression and anxiety. (Tr. 379, 405, 407-08, 410).

Vocational expert ["VE"] Vanessa Harris also testified at the second administrative hearing. (Tr. 432-36). The ALJ asked Ms. Harris a hypothetical question regarding an individual with Plaintiff's vocational profile who could do a range of medium work. (Tr. 434). Ms. Harris replied that the hypothetical individual could perform about 12,000 medium, light and sedentary jobs in the Dayton/Springfield area. (*Id.*). The VE stated that her testimony was consistent with the *Dictionary of Occupational Titles* ["*DOT*"], except as to the sit-stand option and "no teamwork" limitations. (Tr. 435). Ms. Harris further testified that a limitation of standing/walking less than two hours a day and sitting less than

---

[2]The remaining citations will identify the pertinent SSI Regulations with full knowledge of the corresponding SSI/DIB Regulations.

two hours a day would be less than full-time work.  (Tr. 434-35).  On cross-examination by Plaintiff's counsel, Ms. Harris testified that missing four or more days of work per month would preclude sustained employment.  (Tr. 436).

Turning to the remaining information in the administrative record, the most significant evidence for purposes of the present case consists of Plaintiff's medical records and the opinions of several medical sources, summarized as follows.

### *Physical Impairments*

An MRI of Plaintiff's cervical spine from April 28, 1998, showed a mild to moderate degree of central canal stenosis at the C5-C6 level; at least mild right and moderate left foraminal stenosis; and mild overall central canal stenosis and minimal foraminal stenosis greater on the left at the C6-C7 level.  (Tr. 155).

In July 2003, Amita Oza, M.D., examined Plaintiff for the Ohio Bureau of Disability Determinations ["BDD"].  (Tr. 158-64).  Dr. Oza found no clinical evidence of radiculopathy.  (Tr. 160).  Plaintiff's reported chronic neck pain appeared to be secondary to arthritis.  (*Id.*).  Plaintiff's low back pain after a previous injury appeared to be secondary to chronic strain.  (*Id.*).  Dr. Oza also noted that Plaintiff could have early arthritis secondary to prior injuries.  (*Id.*).  Dr. Oza felt that activities with "too much" lifting, bending, stooping, sitting and

4

standing could be affected.  (*Id*.).  A lumbar spine x-ray taken in conjunction with this examination revealed evidence of mild osteopenia and possibly some vertebral facet joint arthropathy.  (Tr. 165).

On August 24, 2003, Gary E. DeMuth, M.D., reviewed the record as an agency reviewing physician and completed a  Residual Functional Capacity Assessment.  (Tr. 171-79).  Dr. DeMuth concluded that Plaintiff could lift and/or carry 50 lbs. occasionally and 25 lbs. frequently; and could stand, walk and sit for a total of about six hours in an eight-hour workday.  (Tr. 173).  Plaintiff frequently could climb, balance, stoop, kneel, crawl and crouch.  (Tr. 174).  On January 20, 2004, David A. Rath, M.D., affirmed Dr. DeMuth's assessment.  (Tr. 179, 219).

On September 26, 2003, Dr. Richard Sievers, Plaintiff's treating physician, reported that Plaintiff suffered from osteopenia, rheumatoid arthritis, and chronic neck and back pain.  (Tr. 208).  Dr. Sievers also reported that Plaintiff had Heberden's nodes at the distal interphalangeal joints.  (*Id*.).  Dr. Sievers noted that Plaintiff's back and neck pain increased with activity and was consistent with arthritis.  (*Id*.).  He stated that both of her hands remained consistently swollen due to the Heberden's nodes and arthritis.  (*Id*.).  An x-ray of the cervical spine

dated November 3, 2003, showed moderately advanced discovertebral degenerative changes at C5-6 and C6-7, and anterolisthesis of C4 on C5. (Tr. 195).

In January 2004, Dr. Sievers completed an Arthritis Residual Functional Capacity Questionnaire. (Tr. 204-07). He reported that Plaintiff had reduced range of motion of the cervical spine and right shoulder. (Tr. 204). He noted additional objective signs, such as reduced grip strength, tenderness, redness, swelling and muscle spasm. (*Id.*). Dr. Sievers indicated that Plaintiff would be able to stand, walk and sit less than two hours total in an eight-hour work day. (Tr. 206). According to Dr. Sievers, Plaintiff would require employment that allowed her to alternate between standing and sitting as needed, and would need to take unscheduled breaks every one to two hours during a typical eight-hour work day. (*Id.*). Plaintiff's pain and symptoms would interfere frequently with the attention and concentration needed to perform simple tasks, but Plaintiff could do low stress work. (Tr. 205). Dr. Sievers indicated that Plaintiff could lift and carry no more than 10 lbs. (*Id.*). Dr. Sievers opined Plaintiff would miss, on average, four or more days a month due to her physical impairments. (Tr. 207).

Plaintiff treated at the Berry Family Health Center from February 2, 2005, through October 27, 2007. (Tr. 222-26, 304-23, 332-35). She initially was seen by Rebecca Adams, M.D., on February 2, 2005, to establish primary health care. (Tr.

226).  On February 16, 2005, Dr. Adams reported that Plaintiff was alert and oriented, with a normal gait.  (Tr. 225).  Plaintiff had no atrophy, normal strength in all extremities, and limited neck motion on the left.  (*Id.*).  Motion of all other joints of the extremities was normal, and there were no sensory or reflex deficits. (*Id.*).  Physicians at the health center had prescribed medications for chronic neck and low back pain and anxiety/ depression during the course of treatment.  (*See* Tr. 222-26, 304-23, 332-35).  Dr. Adams reported that Plaintiff was doing well, and her depression and anxiety were better due to medication.  (Tr. 225).

An MRI of Plaintiff's cervical spine on February 17, 2005, revealed Grade I spondylolisthesis at C4-C5 and severe facet arthropathy on the right, with facet subluxation and synovial cyst formation, with resulting moderate to severe right foraminal narrowing; moderate to large endplate spur with moderate compression of the ventral surface of the cord at C5-C6, with moderate to severe left lateral recess and left neural foraminal encroachment; and moderate broad-based left paracentral disc protrusion and endplate spur at C6-C7, with mild compression of the left ventral surface of the cord, moderate left lateral recess and moderate to severe left foraminal narrowing.  (Tr. 220-21).

A February 27, 2007, progress note indicated that Ativan worked well for Plaintiff's anxiety, and Plaintiff's ankle fracture had resolved.  (Tr. 306).  She had

no neurological deficits and a calm affect.  (*Id.*).  An examination on October 27, 2007, showed that Plaintiff had no psychiatric or neurological complaints, and also no strength deficits or neurological abnormalities.  (Tr. 333-34).

### *Mental Impairments:*

On August 4, 2003, Plaintiff was evaluated by psychologist Ty Payne, Ph.D., at the request of the Ohio BDD.  (Tr. 166-170).  Dr. Payne reported that Plaintiff was cooperative, but her stream of thought was "slowed" and she seemed to have "partial abstract thinking capabilities."  (Tr. 167).  She spoke softly and sometimes mumbled, requiring that she be asked to repeat herself; Dr. Payne estimated that he was able to understand 75 percent of what she said. (*Id.*).

Dr. Payne observed that Plaintiff appeared to be anxious and depressed and reported suicidal ideation, but no attempts.  (Tr. 168).  He noted that she had some paranoid traits, stating that she felt that people were watching her, but she reported no hallucinations, delusions, obsessions or compulsions.  (*Id.*).  Dr. Payne reported that Plaintiff could not do serial sevens and could recall two of three objects after five minutes.  (*Id.*).  She correctly answered two of three mental math calculations.  (*Id.*).  He noted that she had some difficulty with abstractions, but her insight and judgment were adequate.  (Tr. 168-69).  As to her daily

activities, Plaintiff reported that she awoke at 7:00 a.m., drove her husband to work, visited her mother, did some chores, and then picked her husband up from work.  (Tr. 169).  She drank about a 12-pack of beer and smoked about a pack of cigarettes per day, and did not get any regular exercise.  (*Id.*).  She did laundry, cooked, shopped for groceries, paid bills, and washed dishes.  (*Id.*).

Dr. Payne diagnosed an adjustment disorder with depressed mood and a panic disorder without agoraphobia, and assigned Plaintiff a Global Assessment of Functioning ["GAF"] score of 46.  (*Id.*).  He opined that Plaintiff's ability to relate to others, including fellow workers and supervisors, was markedly impaired.  (Tr. 170).  Dr. Payne found that Plaintiff's ability to sustain the concentration and attention required for normal employment would be moderately impaired.  (*Id.*).  He further found that Plaintiff was markedly impaired in her ability to withstand the stress and pressures of day-to-day work activity.  (*Id.*).

Kathlyn D. Currier, Ph.D., treated Plaintiff from December 15, 2003, to February 13, 2004.  (*See* Tr. 209-10).  On July 26, 2005, Dr. Currier reported that Plaintiff's diagnoses from that time period were post-traumatic stress disorder; social phobia, generalized; panic disorder with agoraphobia; and major depressive disorder, recurrent, moderate.  (Tr. 228).  Dr. Currier opined that

Plaintiff's anxiety would interfere with concentration, learning and memory. (*Id*.). She further opined that Plaintiff would be uncomfortable around people she did not know, and that her ability to tolerate routine stressors was compromised by her high level of anxiety and depression. (*Id*.). Dr. Currier felt that Plaintiff "seemed capable of working through and changing her symptoms" with time, but noted that she had not seen Plaintiff in over a year. (*Id*.).

Michael T. Farrell, Ph.D., evaluated Plaintiff on September 22, 2005, at the request of her attorney. (*See* Tr. 229-236). Plaintiff reported that she lived with her husband and two children. (Tr. 230). She was able to care for her basic personal needs and to drive. (*Id*.). Plaintiff reported doing household chores "with difficulty" due to pain, and interacting socially only with her family. (Tr. 231). Dr. Farrell reported that Plaintiff's thoughts "were not well organized;" she tended to digress or go off on tangents. (Tr. 233). He noted that Plaintiff's memory and concentration appeared to be moderately impaired, as she was unable to do a reverse serial three task from 100 and remembered only two of five objects after a five minute time lapse. (*Id*.).

Dr. Farrell diagnosed major depressive disorder-recurrent, generalized anxiety disorder, and panic disorder with agoraphobia. (Tr. 234). He opined that Plaintiff was "too emotionally unstable to engage in any type of sustained

10

remunerative employment." (Tr. 235). According to Dr. Farrell, Plaintiff was moderately impaired in cognitive and social functioning, and moderately to severely impaired as to stress tolerance. (*Id.*). Dr. Farrell opined that Plaintiff was unable to work in any capacity on a full-time basis without significant disruption due to psychologically-based symptoms, and was totally disabled by psychological factors alone. (*Id.*).

On September 18, 2003, Robelyn S. Marlow, Ph.D., reviewed the record on behalf of the Ohio BDD (Tr. 181-94), and concluded that Plaintiff had mild restriction of activities of daily living, and mild difficulties in maintaining social functioning, concentration, persistence or pace. (Tr. 191).

Dr. Payne again evaluated Plaintiff on October 17, 2007. (Tr. 324-31). He reported that Plaintiff appeared tense, restless and "fidgety" during the evaluation. (Tr. 326). Her stream of thought remained somewhat slowed, but she was more understandable than during her prior visit. (*Id.*). Plaintiff was cooperative and her speech was relevant, coherent and fairly well organized. (*Id.*). She stated that her depression was at five on a scale to 10, and denied any suicidal ideation. (*Id.*). She complained of anxiety and panic attacks, and displayed some paranoid traits, but reported no delusions, hallucinations, compulsions or obsessions. (*Id.*). She was oriented and usually alert, although

11

occasionally distracted, and was in adequate contact with reality.  (*Id*.).  She reported memory difficulty, but was able to do serial sevens without any mistakes and to do some abstracting.  (Tr. 327).  She exhibited good insight and fair judgment.  (*Id*.).

Dr. Payne diagnosed major depression, recurrent; panic disorder without agoraphobia; and alcohol abuse, in remission.  (Tr. 328).  He assigned a GAF score of 50.  (*Id*.).  Dr. Payne opined that Plaintiff's ability to relate to others was moderately to markedly impaired; her ability to sustain concentration and attention was moderately impaired; and her ability to withstand the stress and pressures of day-to-day activities was markedly impaired, although she could understand and follow through with moderately complex tasks and deal with written instructions.  (Tr. 328, 330).

At the second administrative hearing, Mary Eileen Buban, Psy.D., the medical expert, engaged in a lengthy description of the record.  (Tr. 419-27).  Dr. Buban then testified that Plaintiff's mental impairments did not meet or equal any psychological Listing.  (Tr. 427).  Dr. Buban also opined that Plaintiff did have some restrictions, including no dealing with the public.  (*Id*.).  According to Dr. Buban, Plaintiff also should be limited to only casual contact with coworkers

12

and no work with strict production quotas or strict time schedules, although she could work independently once she learned a job. (Tr. 427-28).

## III.    THE "DISABILITY" REQUIREMENT & ADMINISTRATIVE REVIEW

### A.    <u>Applicable Standards</u>

To be eligible for SSI or DIB, a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §§ 423(a), (d); 1382c(a). The definition of the term "disability" is essentially the same for DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job, and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See id.* A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. (*See* Tr. 22-23); *see also* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any Step terminates

the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully

considered, the sequential review considers and answers five questions:

> 1.    Is the claimant engaged in substantial gainful activity?
>
> 2.    Does the claimant suffer from one or more severe impairments?
>
> 3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
>
> 4.    Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
>
> 5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279

F.3d 348, 354 (6th Cir. 2001).

**B.    The ALJ's Decision**

At Step 1 of the sequential evaluation, the ALJ found that Plaintiff had not

engaged in substantial gainful activity in 2000 or after 2001.  (Tr. 25).

The ALJ found at Step 2 that Plaintiff has the severe impairments of

cervical and lumbar degenerative disc disease; asymptomatic hepatitis C in

14

apparent remission; anxiety disorder; depressive disorder; and a history of alcohol abuse now in reported remission. (*Id.*). The ALJ determined at Step 3 that Plaintiff does not have an impairment or combination of impairments that meet or equal the level of severity described in Appendix 1, Subpart P, Regulation No. 4. (Tr. 26).

At Step 4, the ALJ found that Plaintiff retained the residual functional capacity ["RFC"] to perform a limited range of medium work, with the following restrictions: lifting 25 pounds frequently and 50 pounds occasionally; alternating positions every 20 to 30 minutes; and inside work in a temperature-controlled environment. (Tr. 28). Plaintiff retained the mental capacity to perform low stress jobs; no dealing with the public; no fast paced work; no strict time or production quotas; minimal and superficial contacts with supervisors and co-workers; no teamwork; and no constant, over-the-shoulder supervision. (*Id.*). The ALJ further found that Plaintiff was unable to perform her past relevant work as a kitchen helper/dishwasher, housekeeper/cleaner, order filler or assembler/production worker (Tr. 30), but remained able to perform a significant number of other jobs. (Tr. 31). This assessment, along with his findings throughout his sequential evaluation, led the ALJ ultimately to conclude that Plaintiff was not under a disability and thus not eligible for SSI or DIB. (Tr. 32).

15

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r. of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . ." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r. of Soc. Sec.*, 582

F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by

substantial evidence, 'a decision of the Commissioner will not be upheld where

the SSA fails to follow its own regulations and where that error prejudices a

claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*,

582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v.

Comm'r. of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.      DISCUSSION

### A.      The Parties' Contentions

The crux of this matter is whether the ALJ's determination that Plaintiff

retained the RFC to perform a limited range of medium work was supported by

substantial evidence.  (*See* Doc. #7 at 1; Doc. #10 at 1, 7).  Specifically, as to her

physical RFC, Plaintiff urges that the ALJ misapplied the standards governing

medical opinion evidence by rejecting the opinion of Dr. Sievers, her treating

family practice physician, and instead crediting the opinions of Drs. DeMuth and

Rath, the state agency reviewing physicians.  (Doc. #7 at 11-12; Doc. #10 at 1-3).

As to her mental RFC, Plaintiff contends the ALJ failed to consider any of the

factors set forth by the Regulations when evaluating the opinions of the medical

expert, Dr. Buban (Doc. #7 at 12; Doc. #10 at 3-5); the state agency evaluating

psychologist, Dr. Payne (Doc. #7 at 13; Doc. #10 at 5); the treating

17

psychotherapist, Dr. Currier (Doc. #7 at 14; Doc. #10 at 5-6); or the examining psychologist, Dr. Farrell.  (Doc. #7 at 15; Doc. #10 at 6-7).  According to Plaintiff, the weight of the evidence supports a finding that the severity of her mental impairments meets and/or equals Sections 12.04 and 12.06 of the Listings of Impairments due to her depressive disorder, generalized anxiety disorder and panic disorder.  (Doc. #7 at 15).  Finally, Plaintiff argues that the ALJ erred by relying on an improper hypothetical to the vocational expert.  (*Id.* at 15-16). Plaintiff urges that the ALJ's errors in these regards mandate a reversal of the ALJ's decision for an award of benefits.  (*Id.* at 16).

The Commissioner contends that substantial evidence supports the ALJ's decision.  (Doc. # 9).  Defendant argues that the ALJ weighed the opinions of Dr. Sievers, Dr. Farrell and Dr. Payne in accordance with controlling law, and reasonably determined that Plaintiff could do a range of medium work that included a significant number of jobs.  (*Id.* at 10).  In assessing Plaintiff's mental impairments and resultant limitations, Defendant argues, the ALJ reasonably relied on the testimony of the medical expert, Dr. Buban, at the final hearing.  (*Id.* at 15).  Defendant contends that the ALJ considered all of the relevant evidence of record and reasonably determined that Plaintiff's mental impairments did not meet or equal Listing 12.04 or 12.06.  (*Id.* at 17).  Finally, the Commissioner

reasons that the hypothetical question posed to the VE, and the corresponding answer on which the ALJ relied, were adequate and proper because the hypothetical incorporated all of Plaintiff's substantiated impairments and resulting limitations. (*Id.* at 18).

### B.    Medical Source Opinions

#### 1.    *Treating Medical Sources*

The treating physician rule, when applicable, requires an ALJ to place controlling weight on a treating physician's or psychologist's opinion rather than favoring the opinion of a nonexamining medical advisor or one-time examining physician or psychologist, or a medical advisor who testified before the ALJ. *Blakley,* 581 F.3d at 406; *see Wilson,* 378 F.3d at 544. A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *Id.*

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 581 F.3d at 406

19

(citing *Wilson*, 378 F.3d at 544). More weight generally is given to the opinions of examining medical sources than to the opinions of non-examining medical sources. *See* 20 C.F.R. § 416.927(d)(1). Yet the opinions of non-examining state agency medical consultants have some value and, under some circumstances, can be given significant weight. Consequently, opinions of one-time examining physicians and record-reviewing physicians are to be weighed under the same factors as those of treating physicians, including supportability, consistency and specialization. *See* 20 C.F.R. § 416.972(d), (f); *see also* Social Security Ruling ["SSR"] 96-6p, 1996 WL 374180, at **2-3.

 2. *Non-Treating Medical Sources*

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." SSR 96-6p, 1996 WL 374180, at *2. Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source. *See id*., at *2-*3. The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. § 416.927(b). To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under

20

the factors set forth in Section 416.927(d), including, at a minium, the factors of

supportability, consistency and specialization.  *See id.*; *see also* SSR 96-6p, at \*\*2-3.

**C.    Analysis**

The Appeals Council remanded the May 31, 2006 decision to ALJ Padilla to

evaluate and explain the weight given to the opinions of Dr. Sievers and Dr.

Farrell.  (Tr. 258).  The Appeals Council also ordered ALJ Padilla to reassess

Plaintiff's residual functional capacity, determine whether alcoholism was a

contributing factor material to the disability finding, and secure the testimony of a

vocational expert.  (Tr. 258-59).  A review confirms that ALJ Padilla's June 23, 2008

decision complied with each of the Appeals Council's directives, including as to

the issues on which Plaintiff's current challenges are based.

Dr. Sievers' opinions are contained in two Ohio BDD questionnaires

apparently completed in late 2003 or early 2004,[3] stating that Plaintiff suffered

from osteopenia, rheumatoid arthritis, and chronic neck and back pain.  (*See* Tr.

203, 208).  Neither such form, however, contains much more than bare diagnoses

and conclusions.  (*See id.*).  More importantly, neither such form sets forth any

rationale for the conclusions reached.  (*See id.*).  In a third form called "Arthritis

---

[3]These pages are dated only with an unattributed, handwritten notation at top, but given the dates referenced therein, both must have been completed sometime after September 26, 2003 (*see* Tr. 203, 208), with one apparently completed after November 10, 2003.  (*See* Tr. 203).

21

Residual Functional Capacity Questionnaire," completed in January 2004 (Tr. 204-07), Dr. Sievers in essence opined that Plaintiff was unable to work.

ALJ Padilla specifically declined to give Dr. Sievers' opinion to that effect controlling weight, finding that "the rather marked physical restrictions" Dr. Sievers recommended "must be viewed as far out of proportion to what would be expected" based on the objective medical findings.  (Tr. 29).  The ALJ noted, for example, the lack of proof of active rheumatoid arthritis, and that later medical reports showed that Plaintiff's spinal condition, while "severe," appeared to be "generally stable with conservative treatment," with no evidence of significant nerve damage.  (Tr. 29).

In addition, the dates that Dr. Sievers served as a treating source, the scope of his treatment, and even Plaintiff's response to such treatment cannot be discerned from the limited record available as to Dr. Sievers' treatment relationship with Plaintiff.  (*See* Tr. 203-08).  The presumption underlying the treating physician rule is that a physician who has treated a patient over a long period of time "will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records."  *Barker v. Shalala*, 40 F.3d at 789, 794 (6th Cir. 1994).  The documentation of only a limited treatment relationship between

Dr. Sievers and Plaintiff, combined with the lack of any explanation for his RFC opinion, gave the ALJ a further sound basis for finding that Dr. Sievers' opinion was not well supported.  Because the opinion of a treating physician must be <u>both</u> well-supported by medically acceptable clinical and laboratory diagnostic techniques <u>and</u> not inconsistent with other substantial evidence in the record in order to be entitled to controlling weight, *see Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997), 20 C.F.R. § 416.927(d)(2), ALJ Padilla cannot be said to have erred by refusing to give controlling weight to Dr. Sievers' assessments that the ALJ found to be not well supported and inconsistent with the objective evidence of record.  (Tr. 29).

Contrary to Plaintiff's contentions, the ALJ also did not err in his overall handling of Dr. Sievers' opinion.  (*See id.*).  In declining to fully accept Dr. Sievers' opinion due to considerations of supportability and consistency (*see id.*), the ALJ effectively discharged his obligation to continue evaluating Dr. Sievers' opinion under those same required regulatory factors, consistent with 20 C.F.R. § 416.972(d), (f).  *See Blakley,* 581 F.3d at 406.  The record supports the ALJ's conclusion that Dr. Sievers' opinion was inconsistent with those of Drs. DeMuth and Rath.  (Tr. 171-79).  As noted *supra*, the existing record also reveals no basis for granting Dr. Sievers' opinion greater weight due to the length, nature or extent

23

of his treatment relationship with Plaintiff.  *See id.*; (*see also* Tr. 203-08).   The ALJ

therefore followed appropriate regulatory and case law in determining that Dr.

Sievers' opinion was due "very little deference" (Tr. 29), and his decision to that

effect is supported by substantial evidence.

Substantial evidence also supports the ALJ's reasons for discounting Dr.

Farrell's opinion.  In his 2008 decision, the ALJ gave Dr. Farrell's opinion no

deference because he found it to be inconsistent with Dr. Farrell's own findings on

examination and testing (Tr. 26), as well as with other evidence of record.  (*See* Tr.

27-28).  For example, in October 2007, Dr. Payne observed that Plaintiff was

occasionally distracted, yet alert and able to concentrate sufficiently do to serial

sevens and some abstracting.  (Tr. 327).  Treating physician Dr. Adams found that

Plaintiff's anxiety was improved with Ativan, and that she had "declined"

counseling.  (Tr. 308, 311).  Further, Dr. Buban testified that a listings-level mental

impairment was not met or equaled.  (Tr. 427).

Dr. Farrell also did not support his opinion that Plaintiff could not work

with any specific or notable clinical findings.  (*See* Tr. 235).  Given the lack of

explanation or medical documentation to support Dr. Farrell's opinion, the ALJ

was entitled to discount or reject that opinion.  *See* 20 C.F.R. § 416.927(d)(3) ("The

more a medical source presents relevant evidence to support an opinion,

particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."); *see also Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 173 (6th Cir. 2009) ("Because [the treating doctor] failed to identify objective medical findings to support his opinion regarding [the claimant's] impairments, the ALJ did not err in discounting his opinion."). Plaintiff's contention that the ALJ failed to properly take into account the opinion of Dr. Farrell in determining her RFC therefore is not well taken.

In determining Plaintiff's physical RFC, the ALJ relied on the assessments of the state agency reviewing physicians, Drs. DeMuth and Rath. Again contrary to Plaintiff's contentions, the ALJ did not err by crediting those opinions. *See* SSR 96-6p ("State agency medical and psychological consultant are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act."). Dr. DeMuth reviewed the medical evidence in August 2003, and concluded that Plaintiff could perform medium-level work, with frequent climbing, balancing, stooping, kneeling, crouching and crawling. (Tr. 171-79). Based on the medical evidence, he felt that Plaintiff was not fully credible. (Tr. 177). His conclusions are bolstered by the findings of Dr. Adams, who began seeing Plaintiff in February 2005, and found

25

her to be alert and oriented, walking with a normal gait, with no evidence of atrophy and normal strength in all extremities. (Tr. 225). The ALJ fulfilled the Appeals Council's mandate to reassess Plaintiff's physical RFC by properly evaluating and relying on the opinions of Drs. DeMuth and Rath.

Plaintiff also challenges ALJ Padilla's decision to accord the greatest weight regarding Plaintiff's mental residual functional capacity to the opinion of Dr. Buban, the clinical psychologist who testified as an independent medical expert. The ALJ found that Dr. Buban's analysis was supported by and consistent with the general treatment record as well as the clinical descriptions of other examiners, such as Dr. Payne and Dr. Adams. (*See* Tr. 28). The ALJ further maintained that Dr. Buban's opinion regarding Plaintiff's ability to work without strict production quotas or time standards "is consistent with evidence that [Plaintiff] has a low stress tolerance yet is able to effectively deal with most problems of routine daily life, even in a home where domestic turmoil has reigned." (Tr. 30).

The ALJ's reliance on Dr. Buban's opinion was warranted because she was the only medical source who reviewed the entire mental health record and who also considered Plaintiff's testimony during the ALJ's hearing. (Tr. 419-28). The ALJ thus properly gave Dr. Buban's opinion significant weight. *See* 20 C.F.R. §

416.927(d)(3) ("We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.").

Plaintiff next claims that the ALJ "attempted to make it appear as though Ms. Mahaffy was more active than the evidence actually supports." (Doc. # 7 at 13). Challenging as "not consistent with the substantial evidence of record" the ALJ's conclusion that Plaintiff "was able to effectively deal with most problems of routine daily life" (*id.* at 12-13), Plaintiff claims that her administrative hearing testimony shows that "she does not go grocery shopping alone" but only if accompanied by her mother or husband "due to her anxiety" (citing Tr. 392-394, 418-419), and that "the only person she goes to visit is her mother" (citing Tr. 383, 410. (*Id.* at 13). She also suggests that the ALJ's conclusions are unreliable because he referred to Plaintiff visiting her stepfather (who reportedly has been dead since 1996) and her "daughter" (who reportedly does not exist). (*Id.*). Finally, she implies that the ALJ drew unwarranted conclusions from an emergency room record suggesting that Plaintiff "fell off the porch of a friend's house" (Tr. 27), as the fall actually occurred "at the home of her husband's friend from work." (Doc. #7 at13).

Plaintiff's contentions in this regard lack merit. As a matter of law, an ALJ does not err by considering the claimant's activities of daily living when weighing the medical source opinions of record. *See* 20 C.F.R. § 416.927(d)(4) ("Generally, the more consistent [a medical source's] opinion is with the record as a whole, the more weight we will give that opinion."). Although Plaintiff advances her hearing testimony as showing that the ALJ here mis-characterized her activities of daily living, a review of her testimony fails to demonstrate that the ALJ's findings were not supported by substantial evidence. The ALJ explicitly acknowledged that Plaintiff "related vaguely that someone is always with her when she goes out." (Tr. 27). He correctly recognized, however, that Plaintiff nonetheless reported being able to cook, wash dishes, do laundry, dust, make beds, go shopping, attend church monthly, go to the food pantry, watch television, drive her husband to and from work, and regularly visit her mother. (Tr. 27; *see* Tr. 169, 326-27, 410). Although the Court is skeptical of the probative value of such activities as to the ultimate question of whether Plaintiff is under a "disability" within the meaning of the Social Security Act, the Regulations do permit ALJs to consider such activities in analyzing the medical sources, and substantial evidence supports ALJ's Padilla's synopsis of Plaintiff's reported activities.

28

In addition, other factual errors purported to infect the ALJ's analysis do not undercut his overall impression regarding Plaintiff's activity level.  Despite Plaintiff's insistence that the porch from which she fell belonged to her husband's (not her own) friend (Doc. #7 at 13; *see* Tr. 367), that clarification merely reinforces the correctness of the ALJ's supposition that Plaintiff was out socializing on that occasion in 2006.  (*See* Tr. 27, Tr. 345).  Similarly, the AlJ's observations about help from an apparently non-existent daughter and visits with an apparently deceased stepfather (Tr. 27; *see* Doc. #7 at 13, Tr. 367)[4] do not erode his otherwise presumably correct conclusions that Plaintiff received help with household chores and visited family members.  (Tr. 27).  The ALJ's citations to the record demonstrate that substantial evidence supports his material factual findings, taken as a whole, about Plaintiff's daily activities.

Stressing her perception that the ALJ did not consider the factors set forth by the Regulations, Plaintiff further asserts that the ALJ failed to properly weigh the opinions of Drs. Payne and Currier.  (Doc. #7 at 13-15).  However, ALJ Padilla

---

[4]ALJ Padilla's comments about Plaintiff's "stepfather" and "daughter" appear to have been drawn directly from the 2007 report of Dr. Payne (*see* Tr. 327: "[o]nce a week she will go to see her stepfather," and "her daughter assists her with washing," *etc.*), on which report Plaintiff ironically urges the ALJ should have relied more heavily (*see* Doc. #7 at 13-14), irrespective of those same apparent errors alleged to render the ALJ's decision unreliable.  Whether such errors are attributable to Plaintiff herself (*e.g.*,referring to her stepdaughter as her "daughter") or to Dr. Payne mis-reporting Plaintiff's statements, however, is immaterial to the inquiry, as the only material issue before us on this point is whether the ALJ overstated Plaintiff's activities of daily living as a result of these apparent errors.

discussed Drs. Payne's and Currier 's opinions in his prior decision of May 31, 2006.  (*See* Tr. 250).  The Appeals Council found no error in ALJ Padilla's handling of those opinions at that time.  (*See* Tr. 258-59).  Although Plaintiff may disagree with the ALJ's weighing of the evidence, the ALJ's conclusions fall within the zone of reasonable choice.  *See Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986) ("The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decision makers can go either way, without interference by the courts.").  As such, this Court is not free to second guess those conclusions.

Finally, Plaintiff contends that the ALJ's hypothetical questions to the vocational expert were improper, in essence because they failed to include the limitations set forth by Dr. Sievers.  Having previously concluded that the ALJ did not err by discounting Dr. Sievers' disability opinion, this Court is compelled to conclude that the ALJ also did not err by declining to adopt the limitations opined by Dr. Sievers in the RFC hypothetical posed to the VE.  In fashioning such hypothetical questions, an ALJ "is required to incorporate only those limitations accepted as credible."  *Casey* v. *Secy of Health* & *Human Servs.,* 987 F.2d 1230, 1235 (6th Cir. 1993); *see also Stanley* v. *Sec'y of Health & Human Servs.,* 39 F.3d 115, 118 (6th Cir. 1994) ("[T]he ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals.").  Because the ALJ's hypothetical to the VE in this case

encompassed all restrictions that the ALJ found to be credible, he did not err by

relying on the VE's response.

**IT THEREFORE IS RECOMMENDED THAT**:

1.      The Commissioner's final determination that Sandra Mahaffy is not
        under a "disability" within the meaning of the Social Security Act be
        AFFIRMED; and

2.      The case be TERMINATED on the docket of this Court.

June 11, 2010                           ____s/Sharon L. Ovington_____
                                             Sharon L. Ovington
                                        United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen [14] days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen [17] days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen [14] days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981).